# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>THOMAS TUCK ZARUBA,<br><br>　　　　Debtor. | Case No. J07-00100-DMD<br>Chapter 11<br><br>**Filed On 3/11/08** |
| In re:<br><br>KOMA EQUIPMENT LEASING COMPANY, LLC,<br><br>　　　　Debtor. | Case No. J07-00101-DMD<br>Chapter 11 |
| In re:<br><br>KOMA SALES COMPANY, LLC,<br><br>　　　　Debtor. | Case No. J07-00103-DMD<br>Chapter 11 |

**MEMORANDUM ON DISCLOSURE STATEMENTS AND PLANS**

The debtors' disclosure statements and plans came before the court for hearing in Juneau on February 5th and 6th, 2008 and in Anchorage on February 29, 2008. This court has jurisdiction over the proceedings pursuant to 28 U.S.C. § 1334(b) and the district court's order of reference. The hearings on disclosure statements and plans are core proceedings under 28 U.S.C. § 157(b)(2)(L). The disclosure statements will not be approved and the plans will not be confirmed.

The background of this controversy is set forth in my memorandum of December 28th, 2007 and incorporated by reference[1].

The first matter for decision is whether the disclosure statements contain "adequate information" within the meaning of 11 U.S.C. § 1125(a)(1).

> 'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information; . . .[2]

The debtors' disclosure statements contain little discussion of the federal tax consequences of the plans. In the Zaruba disclosure statement, the disclosure statement alleges: "Debtors have been advised that there will be no adverse tax consequences as a result of the transactions proposed in this plan."[3] Creditors are left to guess who formulated

---

[1] Memorandum on HTC's Motion for Dismissal or Conversion, D.E. 128, Case No. J07-00100-DMD, pp. 2-4.

[2] 11 U.S.C. § 1125(a)(1).

[3] Amended Disclosure Statement, D.E. 132, Case. No.J07-00100-DMD, p.17.

2

this opinion. The disclosure statement proceeds to state it's view that any income from the sale of assets should be offset by deductions from payments to creditors. No source is given for this view. It does not constitute an adequate discussion of the tax effects of the plan. It also ignores the tax effects of the plan on a typical creditor in the case.

Huna Totem Corporation ("HTC") alleges that the information contained in the disclosure statements is inadequate in other respects. The disclosure statements fail to list any of the appraised values that conflict with the debtor's estimates as to value. The debtors could have easily included a chart, similar to the cover of their white book of exhibits, to show the many variations found in appraisals of the assets. The disclosure statements are deficient in this respect.

HTC also complains of an inadequate liquidation analysis. The liquidation analysis attached as Exhibit "D" to the Zaruba's disclosure statement merely concludes that all the requirements of 11 U.S.C. § 1129(a)(7) have been met in all three cases, apparently because all classes except HTC have consented to the plan. 11 U.S.C. § 1129(a)(7) does not deal with disclosure. Instead, it requires that impaired classes receive at least the amount they would receive in a Chapter 7 liquidation unless they have accepted the plan. The debtors appear to have dispensed with an appropriate liquidation analysis because most creditors have voted for the plans. Proper disclosure, however, is a predicate to plan solicitation and voting. Votes cannot be counted until proper disclosure has been made.

Even if the disclosure statements were adequate, the plans otherwise fail to meet the confirmation requirements of the code as set forth in 11 U.S.C. § 1129. "The debtor bears the burdens of both introduction of evidence and persuasion that each subsection of

3

section 1129(a) has been satisfied. . . the plan proponent bears the burden of proof by a preponderance of the evidence."[4] HTC alleges that the debtors' plans have failed to meet the confirmation requirements on a variety of grounds.

The primary objection voiced by HTC is that the debtors' plans are not feasible. 11 U.S.C. § 1129(a)(11) requires that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Collier states:

> The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation. In determining whether a plan meets the requirements of § 1129(a)(11), . . . the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.[5]

The liquidating trust provisions of the debtors' plans do not have a reasonable prospect of success for several reasons. The debtors' amended plans contain a variety of provisions which depend either on the debtors and HTC reaching an agreement or, failing that, the application of general, non-specific standards. Given the bitter history of litigation

---

[4] 7 COLLIER ON BANKRUPTCY ¶ 1129.02[4](15th ed. revised 2007)(citations omitted).

[5] 7 COLLIER ON BANKRUPTCY ¶ 1129.03[11](15th ed. revised 2007)(citations omitted); *Pizza of Hawaii, Inc. v. Shakey's Inc. (Matter of Pizza of Hawaii, Inc.),* 761 F.2d 1374, 1382 (9th Cir. 1985).

between the debtors and HTC, these provisions will lead to uncertainty and more litigation. Rather than pay the claim or turnover assets if the appeal is resolved in favor of HTC, the debtors seek to establish a liquidating trust. The trust assets are to consist of a variety of boats, buses, a remainderman's interest in a home and a 1974 Corvette. The plan provides that after confirmation, but before completion of the appeal, the debtors won't sell or transfer the trust assets without HTC's consent. But HTC's consent cannot be unreasonably withheld "and shall be deemed given if a particular Trust Asset is leased or chartered for fair value to an unrelated third party and, in the event a particular Trust Asset is sold, the net sale proceeds are escrowed."[6] The parties have been enmeshed in bitter and contentious litigation for several years. Protracted attempts at mediation have been unsuccessful. There is no reason to believe that somehow this feud will end when the debtors seek to alienate assets. There will be litigation and uncertainty over the disposition of assets.

If HTC should prevail in the appeal, the debtors will "propose to Class X how the Trust Assets shall be liquidated, sold or transferred"[7] to satisfy it's claim. "If Class X does not consent to the proposal, and if the parties are unable to agree on a mutually acceptable method of satisfying the claim, then Class X may move for the Bankruptcy Court to appoint a Trustee of a Liquidating Trust."[8] More uncertainty and litigation. This time it is over the need to appoint a trustee for the liquidating trust. If HTC should prevail and receive an order allowing a trustee for the trust, there is no assurance anyone would want the

---

[6] Debtors' Amended Plan of Reorganization, D.E. 133 in Case No.J07-00100-DMD, p.4.

[7] *Id.*

[8] *Id.*

5

job. The pay is lower than that of a bankruptcy trustee, a flat 3% commission. Any potential trustee must also factor in the significant possibility of a suit by a party offended by his liquidation techniques.

Should a liquidating trustee be appointed, there is still more uncertainty. The trustee can sell assets in the liquidating trust, but "the order in which trust assets are liquidated shall take into consideration the amount of Class X's claim, the value and liquidity of the various Trust Assets, and Zaruba's personal and family needs and desires."[9] HTC would be stuck with a trustee who must take into account Mr. Zaruba's desires. This provision effectively annuls the purpose of having a liquidating trust to begin with.

The proposed treatment of HTC under the plans does not offer a reasonable prospect of success. The liquidating trust arrangement is not workable. The plans are full of provisions that will lead to uncertainty and needless litigation. Even if the liquidating trust arrangement was feasible, the assets proposed to fund the trust are inadequate.

The most contentious issue at confirmation has been the proper valuation of the debtors' five fishing boats. According to Zaruba's expert, Michael Windred, the boats had a total value of $334,700.00 as of September 2007. James Sepel, one of HTC's experts, found the fishing boats to be worth but $217,000.00 as of November 2007. Tim Murphy, a second HTC expert, values them at $175,000.00, but only after shipping them to Seattle at a cost of $16,000.00. I find the testimony of Sepel to be persuasive and adopt his findings as to the values of the fishing boats for several reasons.

---

[9]*Id.*

6

First, Sepel has much more experience as a marine surveyor than Windred or Murphy. Sepel has been a marine surveyor for fifteen years. Windred purchased a survey business and has a year's worth of experience as a marine surveyor. Murphy is an auctioneer and not an accredited marine surveyor. Sepel also has superior credentials when compared to Windred or Murphy. Sepel has passed the Society of Accredited Marine Surveyors (SAMS) examination in 1993. He has been active as an officer of SAMS and is currently its president. Neither Windred nor Murphy are accredited marine surveyors or members of SAMS. Sepel has superior knowledge and professional standing. His opinion is entitled to more weight than the opinions of Windred or Murphy.

Moreover, Windred's findings are counter-intuitive. The debtors paid but $210,000.00 for the boats in 2003, after three years of use. That is a decline of $140,000.00 in three years from their original purchase price of $350,000.00. The boats have received heavy use from HTC. While four of the five engines have been replaced, the boats have been exposed to the elements in a marine environment for eight years. They have not been placed in covered moorage or storage facilities. They have numerous scratches, dings, and other imperfections consistent with their use as commercial charter vessels. There are delaminations of the fibreglass tabbing underneath the v-births in all of the boats. The boats are eight years old and show their age. Windred's values are unduly optimistic. He cannot justify an appreciation of $124,000.00 from the debtors' 2003 cost to his November 2007 values under such circumstances. I find the value of the fishing boats to have been

7

$219,000.00 as of November 2007.[10]  The boats continue to depreciate.  Using the latest BUC guide data, they have a value of about $197,100.00 as of February, 2008.  That sum is worth less than the $210,000.00 currently outstanding to Alaska Pacific Bank on the underlying encumbrance.  The fishing boats do not contribute any equity to the liquidating trust.

Zaruba's *Eagle One* is a different story.  It is a 65 foot motor yacht in very good condition.  It has an aluminum hull and is powered by twin Detroit diesel 12V-71 turbo marine diesel motors that produce nearly one thousand horsepower.  While it is 41 years old, and Zaruba purchased it for only $80,000.00, the yacht has been very well maintained.  The replacement value of the yacht is $1.1 million.  Windred valued the yacht at $435,000.00.  Murphy valued if at $300,000.00.  Sepel placed it's value at $400,000.00.  I find Sepel's appraisal to be most persuasive and value the yacht at $400,000.00.  Zaruba has an encumbrance of about $235,000.00 on the yacht.  After costs of sale are deducted at 10%, the yacht could contribute about $125,000.00 in value to the liquidating trust.

The debtors' buses have been another bone of contention.  Debtor Koma Equipment purchased the buses for $265,000.00 in 2004.  The buses consist of four 25 passenger 2004 Ford E-450 models all with V-10 gasoline motors.  One additional bus, also a V-10 2004 E-450, has room for 22 passengers with a lift for wheelchairs.  Michael Windred inspected the vehicles in Hoonah.  He has experience in buying and selling similar buses through his prior employment with Alaska Travel Adventures.  Windred found the vehicles

---

[10] I have taken Sepel's appraised value of $217,000.00 and added $2,000.00 for a motor replacement that he overlooked in his appraisal.

8

to be in very good overall condition with low mileage, from seven to fourteen thousand miles. Some of the buses had damage to their rear bumpers. One had a variety of minor body defects. Windred valued the buses from $175,000.00 to $195,000.00 overall. He thought the vehicles could be sold in either Juneau or Skagway. HTC's appraiser was auctioneer Tim Murphy. He valued the buses at $25,000.00 each for a total of $125,000.00, but only after shipping them to Seattle for $9,085.00. I find the buses have a present value of $32,500.00 each, for a total value of $162,500.00 in Juneau. After deducting Key Bank's first lien position and costs of sale, the buses would contribute equity of about $60,500.00 to the liquidating trust.

Zaruba seeks to contribute equity of $154,000.00 to the liquidating trust through his interest in his mother's home. His mother retains a life estate in the home, however, and there is no market for remainderman interests. While Zaruba's mother is in her nineties, she could live for another ten years. Zaruba's interest in his mother's home is too speculative to be commercially viable. It adds no real value to the proposed liquidating trust.

Finally, Zaruba proposes to contribute his 1974 Corvette sport coupe to the trust. The Corvette has a small block V-8 with 195 horsepower. The car has 76,000 miles on it. Zaruba stores it in his mother's garage. It hasn't been restored. It has an automatic transmission and factory air. The convertible or "roadster" model is more popular than the coupe. Zaruba values the Corvette at $42,385.00 based on high NADA book values obtained over the internet. Kenneth Spencer, a car salesman, said the vehicle should sell for high NADA book value. Mike Hatch, a Juneau Jeep dealer, echoed Spencer's conclusions.

9

Neither Hatch or Spencer gave their opinion of the vehicle's value, however. Zaruba obtained NADA book values as of early 2005. They showed a range of $6,450.00 for low retail, $10,250.00 for average retail and high book retail of $16,700.00. Factory air added $1,000.00 to $1,500.00 to the book values. NADA internet values for January 28, 2008 indicate that high retail for the vehicle should be $34,000.00 plus 10% for factory air conditioning for a total of $37,300.00. I don't understand how Zaruba reached a high book value of $42,385.00 under the circumstances.

HTC's expert, Steven Allwine, valued the Corvette at $15,000.00 to $20,000.00. Allwine has spent a lifetime in the car business and knows Corvettes. I found his testimony credible. He thought the overall condition of the vehicle was fair to good. He noticed checking of the fibreglass body, driver's door and tailpiece. He looked beyond NADA values to reach a conclusion. He considered values from Barrett-Jackson, Hemmings, and Vettefinders.com. He concluded that the market for this Corvette sport coupe was impaired. High NADA values didn't apply because it had a small block motor, an automatic transmission and 76,000 miles on it. Based on his testimony, I conclude the Corvette has a present value of $20,000.00.

The total value contributed to the trust is only about $205,500.00. This sum is far short of the $444,888.00 necessary to fund HTC's claim. The plan is not feasible.

Zaruba attempts, in an indirect manner, to discount the face amount of the HTC judgment. He argues that only 79% of the judgment is worthy of "protection," allegedly because the judgment really belongs to PSDC and not HTC. At the same time, the "debtor recognizes that this court does not have the power to reduce the face amount of the HTC

10

judgment . . ."[11]  The judgment that needs protecting is the one entered by the superior court on July 6, 2007, not some revisionist judgment Zaruba now finds appropriate. Moreover, even if I adopted his argument, 79% of the judgment as of February 28, 2008 was $351,462.00. The assets Zaruba proposes to fund the HTC trust are inadequate to fund even a discounted judgment. I reject the debtors' argument.

The income projections prepared by the debtors envision speculative lease rates that are inconsistent with a realistic value of the proposed leasehold assets. The debtors' income projections look to two primary sources of income: the leasing of fishing boats, and the leasing of buses. According to the projections, the debtors are to receive $15,468.00 of income on a quarterly basis from lease payments of the charter boat fleet. That sum is based on a value of $325,650.00, capitalized at 19% per year. Using my present finding as to value, the charter boats are worth but $197,100.00. In another year they will be worth substantially less. Using the same capitalization rate with no depreciation for the current year, quarterly income would be reduced to $9,362.25 per quarter. Similarly, the value of the bus fleet as of January 2009, with 10% depreciation for a year, would yield a value of $144,000.00. Using a capitalization rate of 19%, quarterly payments would decline from $7,268.00 to $6,840.00 per quarter. The debtors' cash flow analysis is deeply flawed and the cash projections are not feasible.

The cash flow projections are also based on another faulty premise: that somehow the debtors will succeed in leasing the boats and buses in 2009. There has been

---

[11]Debtor's Closing Argument, D.E. 160, Case No. J07-00100-DMD, p.5.

11

no evidence presented that firmly and unequivocally establishes a demand for leased buses and boats in the Juneau area. Mr. Zaruba has made inquiries of numerous possible interested parties but has yet to come up with one solid lead. The debtors have failed to carry their burden of proof on this issue, which is essential to their plan.

HTC alleges that the debtors have failed to meaningfully address the tax impact of their plans. I agree. The debtors have offered no expert testimony from a qualified CPA as to the likely tax results of their plans from an IRS standpoint. The debtors have failed to carry their burden of proof in establishing feasible plans. Confirmation must be denied under such circumstances.

As further grounds for denial of confirmation of the plan, HTC alleges that the debtors have "gerrymandered" a class of unsecured claims to meet the requirements of 11 U.S.C. § 1129(a)(10). HTC bases it's argument on *Phoenix Mutual Life Insurance Co. V. Greystone III Joint Venture* [12] and it's progeny.[13] In *Greystone* Phoenix had a secured claim of $5.825 million against an office building. It had an unsecured deficiency claim of $3.5 million. The debtor's plan classified Phoenix's unsecured deficiency claim separately from other unsecured creditors. The fifth circuit reversed an order confirming the plan. It stated: "Thou shall not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."[14] In *Steelcase, Inc. v. Johnston,*[15] another case cited by HTC, the

---

[12] *(In the matter of Greystone III Joint Venture),* 995 F.2d 1274 (5th Cir. 1991).

[13] *In re Route 37 Business Park Associates,* 987 F.2d 154 (3rd Cir. 1993); *In re Lumber Exchange Partnership,* 968 F.2d 647 (8th Cir. 1992); *In re Bryson Properties XVIII,* 961 F.2d 496 (4th Cir. 1992).

[14] *Phoenix Mutual Insurance Co. v. Greystone III Joint Venture,* 995 F.2d at 1279.

[15] *(In re Johnston),* 140 B.R. 526 (9th Cir. B.A.P. 1992).

12

9th circuit bankruptcy appellate panel allowed the separate classification of a disputed unsecured claim. Johnston had sued Steelcase in state court. Under the plan, if the claim of Steelcase was upheld in state court, it was to be paid in full by the debtor. I think the instant case is closer to *Johnston* than *Greystone*. The separate classification of HTC's claim was not proposed solely to secure the vote of an impaired class of claims. Rather, it was proposed as a means of dealing with the estate's only actively disputed claim and in lieu of a state court supersedeas bond. Confirmation of the plan will not be denied because the debtors separately classified HTC's unsecured claim.

HTC alleges that the plans fail to satisfy the absolute priority rule. I agree. The absolute priority rule requires that unsecured creditors receive the present value of their claims prior to the retention of any equity interest in the estates by shareholders or owners.[16] Here Zaruba would retain his equity interests and the plans do not provide HTC with the present value of it's claim. The plans violate the absolute priority rule. While I recognize the fact that Mrs. Zaruba is contributing her interest in the Eagle One and her mother-in-law's home, these contributions are inadequate. A "new value" exception to the absolute priority rule is premised on the proposal of a feasible plan. There is no new value exception for feasibility.

HTC alleges that the plans fail to satisfy the best interests of creditors test.[17] The best interests of creditors test requires that the debtor demonstrate that creditors will fare at least as well in Chapter 11 as they would in Chapter 7. As before, the debtors bear the

---

[16] 11 U.S.C. § 1129(b)(2)(B).

[17] 11 U.S.C. § 1129(a)(7)(A).

13

burden of proof on the issue by the preponderance of the evidence.  The debtors have failed to present an appropriate liquidation analysis. As noted previously, the document labeled liquidation analysis attached as Exhibit "D" to the disclosure statement does not demonstrate the treatment of claims in Chapter 7 and Chapter 11.  It merely recites the debtor's view that HTC will have adequate trust assets devoted to it to satisfy it's claim.  My suspicion is that a through analysis would reveal that Zaruba's general unsecured creditors, class Z-U, are faring much poorer than they would in Chapter 7 because most of the debtor's assets are devoted to attempting to satisfy the HTC claim. I conclude that the debtors have failed to meet their evidentiary burden and the plans fail to meet the best interests of creditors test.

The debtors' disclosure statements will not be approved and the plans will be denied confirmation.   Appropriate orders will be entered.


DATED: March 11, 2008.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:      C. Christianson, Esq.
            D. Bruce, Esq.
            D. Schiffrin, Esq.
            U. S. Trustee
                3/11/08

14